UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

JUWAN MITCHELL,

      Plaintiff,

      v.

J. STAVOLA, *et al.*,

      Defendants.

CIVIL ACTION NO. 3:25-cv-00042

(SAPORITO, J.)

## MEMORANDUM

Juwan Mitchell, a prisoner proceeding *pro se*, brings Eighth Amendment excessive force claims against four officers who allegedly assaulted Mitchell at SCI-Benner Township. The defendants have moved for summary judgment (Doc. 40). Because video of the incident plainly contradicts many of Mitchell's allegations, and the record does not support an inference that the defendants acted "maliciously and sadistically to cause harm," they are entitled to summary judgment.

## I.   BACKGROUND

In the operative complaint (Doc. 16), Mitchell alleges that on June 18, 2024, defendants Capt. J. Stavola, CO1 McGary, CO1 Durst, and Lt. Tyson "slammed" Mitchell into "solid objects," including a door post, and punched Mitchell several times. Mitchell was permitted to proceed on

Eighth Amendment excessive force claims against the four officers.[1]

After discovery closed, defendants moved for summary judgment. (Doc. 40). Mitchell initially responded to the motion by objecting that "he[2] has not seen the defendants['] exhib[i]ts including video[,] photogra[p]hs and statements." (Doc. 47). Defendants filed a certificate confirming service of the moving papers on Mitchell, and a separate declaration that Mitchell was permitted to view video of the incident. *See* (Docs. 49, 49-1). These verifications were provided to Mitchell, and Mitchell was advised that any further request for relief needed to more specifically explain the alleged lack of access to exhibits. (Doc. 51). Ultimately, Mitchell filed an "answer" to defendants' motion for summary judgment (Doc. 53), making no further claim of lack of access to exhibits. Therefore, the summary

---

[1] Upon screening of the complaint pursuant to 28 U.S.C. § 1915A, a series of other claims against these defendants were dismissed. *See* (Docs. 17, 18).

[2] In prior orders, we have referred to Mitchell using female pronouns, based in part on another complaint in this district in which Mitchell identified as transgender and used female pronouns. *See* (Doc. 17 at 1, n.1 (citing *Mitchell v. Confer*, No. 3:25-cv-00216 (M.D. Pa., filed Feb. 4, 2025)). However, Mitchell has used both male and female pronouns in filings in this case. In this memorandum, we use gendered pronouns only when quoting from Mitchell's own filings or other documents in the record.

judgment motion is ripe for review.

## II.    LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that

"the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III.    MATERIAL FACTS

Mitchell's response to the motion consists of a statement of material facts supported by what Mitchell describes as a "declaration"[3], *see* (Docs.

---

[3] Mitchell's declaration includes a statement that Mitchell "realiz[es] that any false statement[s] made to this court are punishable under the law subject to Fine, Imprisonment and Punishment Under The Law." *See* (Doc. 53-1). Whether this makes the declaration competent

*(continued on next page)*

53-1, 53-2), and a supplemental response with additional evidence (Doc. 57). These filings are not compliant with the local rules of this district, but since *pro se* filings must be "liberally construed," *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), we have considered all the evidence and argument Mitchell has submitted.

The summary judgment record indicates as follows: On June 18, 2024, Mitchell was transferred from SCI-Benner Township to an outside hospital, following an incident in which Mitchell placed "a foreign object inside of [Mitchell's] genitals." When Mitchell returned from the hospital at 9:23 p.m., Mitchell was placed in restraints including handcuffs, leg irons, and a "Kuff bag."[4] *See* (Docs. 44-11, 44-12).

---

evidence at the summary judgment stage is open to question. *See Doe v. Heart Sol., PC*, 923 F.3d 308, 315 (3d Cir. 2019) (a statement that is "both unsworn and not given under the penalty of perjury [is] insufficient to create an issue of fact"); 28 U.S.C. § 1746. For purposes of the motion, we will consider the allegations in the declaration as if properly sworn. *See Lauria v. Lieb*, 152 F.4th 549, 552 (3d Cir. 2025) (courts can consider unsworn allegations as a reason to delay summary judgment or "issue any other appropriate order") (citing Fed. R. Civ. P. 56(e)(4)).

[4] For context, we take judicial notice that a Kuff bag is a "straight jacket for the hands" used in conjunction with handcuffs. *See Gibson v. Mason*, No. 3:22-CV-1538, 2025 WL 1932743, at *2 n.3 (M.D. Pa. July 14, 2025) (citation omitted).

### A. Cell Extraction

The following day, June 19, at 9:57 a.m., Mitchell was still in restraints and was being held in a Psychiatric Observation Cell ("POC"). In a written report, Defendant McGary, who was assigned to observe Mitchell, stated that Mitchell attempted to "manipulate the Kuff bag," and refused McGary's orders to stop. McGary deployed O.C. spray into the cell "in order to gain compliance with the orders given." (Doc. 44-5). Mitchell attests that McGary and other officers were "[antagonizing and] messing with" Mitchell. *See* (Doc. 53-2).

Defendants have produced video from the cell and surrounding area, which shows Mitchell biting and tugging at a black strap on the Kuff bag for about 15 seconds. McGary is seen talking into a handheld device for approximately 5-10 seconds. *See* (Doc. 44-2, 0:15-0:25). McGary then approaches the cell and begins to deploy O.C. spray through an opening in the cell door. (Doc. 44-1, 0:09-0:59). Approximately three minutes later, four officers enter the cell, pin Mitchell against a wall, and apply a spit hood over Mitchell's head. (*Id.*, 4:00-4:20).

Three officers, whom defendants identify as COs Durst, McGary, and Knable, removed Mitchell from the cell and escorted Mitchell down

a hallway. Durst and Knable reported that during the escort, Mitchell "attempted to pull away from the escorting officers" and "struck his [right] shoulder" against a door frame in the hallway. (Docs. 44-6, 44-7). In his declaration, Mitchell attests that officers were "tugging," "pulling," and "jerking [Mitchell] around," and ultimately, that they "slamme[d] Mitchell] into the door frame[,] smashing [Mitchell's shoulder] into the door frame very hard."

An officer's handheld camera footage captures Mitchell's removal and escort from the cell. The videotaping officer walks behind the escorting officers, so the camera view is occasionally obscured. As the officers enter the cell, Mitchell repeatedly yells: "I can't see!" An officer says: "Stop resisting"; Mitchell replies: "I'm not! I can't see!" The officers drag Mitchell out of the cell and walk Mitchell down the hallway, while Mitchell yells as if in pain. Mitchell walks with an unsteady gait; Mitchell's legs are shackled and the officers appear to be pushing Mitchell forward. After about 10 seconds of walking in this manner, the group approaches a door frame. The group appears to walk faster as it reaches the door frame, but the video does not clearly show why. Mitchell's right arm or shoulder collides with the door frame as they pass it. Mitchell

continues to yell and groan as if in pain. After the collision, two officers are heard to yell "slow down," and the group begins to walk more slowly. (Doc. 44-3, 00:30-01:45).

### B. RHU and Medical Care

Mitchell was taken to the Restricted Housing Unit ("RHU") for immediate examination and decontamination by medical staff. (Doc. 44-3, 03:05-05:25). During the examination, medical staff repeatedly evaluated Mitchell's shoulder in response to Mitchell's complaints and attended to a cut on Mitchell's ankle. (Doc. 44-4). Video from a camera within the RHU shows that the decontamination and medical examination continued off and on for roughly 30 minutes, with officers and Mitchell talking to each other during breaks. *See* (Doc. 58). Officers removed some of Mitchell's restraints and permitted Mitchell to change into new clothes. After Mitchell changed, the officers restored the restraints and escorted Mitchell out of the room.[5]

---

[5] Although Mitchell began this case by complaining of an assault in Mitchell's own cell, Mitchell now attests that "the major abuse & assault happened" in the RHU after the officer "shut the [handheld] camera off." Mitchell attests that an unspecified officer "picked me up off my feet in the air excessively slamming me to the ground." The RHU video plainly contradicts Mitchell's account; therefore, this attestation is disregarded.

*(continued on next page)*

The following day, June 19, Mitchell was seen by medical staff for a complaint of shoulder pain. Mitchell had an abrasion and "slight edema" on the right shoulder. Mitchell was given one 30 milligram dose of Toradol and prescribed Tylenol as needed. *See* (Doc. 57 at 5-13). X-rays of Mitchell's right shoulder and clavicle, taken the following day, showed no fracture or dislocation, no acute osseous abnormality, and "unremarkable" soft tissue with no evidence of swelling. *See* (*id.* at 14-17).[6]

### C. Grievances

The Pennsylvania Department of Corrections ("DOC") provides a three-part procedure for inmate grievances: initial review by a Grievance Officer, appeal to the Facility Manager, and final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). Under the DOC's

---

*See Scott v. Harris*, 550 U.S. 372, 380 (2007) (when a party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

[6] Given this evidence (which was submitted by Mitchell), Mitchell's own attestations that "nothing was ever done" in response to Mitchell's requests for medical care, and that "after the beating no medical came," *see* (Doc. 53-2), are disregarded. *See Scott*, 550 U.S. at 380.

grievance policy, an inmate must submit the initial grievance within 15 working days after the event in dispute. The initial grievance "must be filed with the Facility Grievance Coordinator/designee at the facility where the grievance event occurred." *See* (Doc. 44-8 (DC-ADM 804, §§ 1(A)(8),(9))). On appeal to final review, the inmate must attach all "required documentation," including copies of the initial grievance, appeal, and the corresponding denials. *Id.*, § 2(B)(1)(j).

At some point after the cell extraction, Mitchell was transferred to SCI-Rockview, and defendants have identified two relevant grievances Mitchell filed from that prison: Grievance #1103116, received August 16, 2024, and Grievance #1109706, received September 24, 2024. Grievance #1103116, filed from SCI-Rockview, was rejected as untimely, improperly formatted, and improperly addressing a matter that occurred at SCI-Benner Township. Mitchell did not appeal it to final review. *See* (Doc. 44-9). Grievance #1109706 was rejected as untimely, and Mitchell's intermediate appeal was denied on the same grounds.[7] Mitchell appealed

---

[7] Although filed at SCI-Rockview, Grievance #1109706 was "forwarded to the SCI Benner Township Security Office" (Doc. 44-10 at 5); apparently for that reason, it was not rejected as directed to the wrong prison.

to final review, but the final appeal was rejected because Mitchell did not provide a copy of the initial rejection notice. *See* (Doc. 44-10).

## IV.   DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendants seek summary judgment for Mitchell's failure to exhaust administrative remedies, but they are not entitled to that on this record. Under the Prison Litigation Reform Act ("PLRA"), prisoners complaining about the conditions of their confinement must exhaust available administrative remedies before they may file suit in federal court. 42 U.S.C. § 1997e(a). The PLRA requires proper exhaustion, meaning plaintiffs must administratively grieve their claims in accordance with the procedural rules of the prison in which they are incarcerated. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Therefore, exhaustion within the DOC generally requires appeal to SOIGA, the third and final step of the process. *See Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004).

Defendants, the parties seeking summary judgment, have the burden to prove the defense of failure to exhaust. *See Brown v. Croak*,

312 F.3d 109, 111 (3d Cir. 2002). Here, they point to two unexhausted grievances as demonstrating Mitchell's failure to exhaust. *See* (Doc. 44, ¶¶ 38-52). However, the record does not show that those grievances were the only relevant ones that Mitchell filed.[8] *See*, *e.g.*, *Brown v. Beard*, No. 13-CV-00465, 2021 WL 1807875, at *7 (E.D. Pa. May 5, 2021) ("Although [defendants] attached several [unexhausted] grievances as exhibits to their motion for summary judgment, they did not point to a declaration from a prison official or any other record evidence indicating they performed an exhaustive search to identify all applicable grievances."); *Hobson v. Tiller*, No. 1:18-CV-00233-SPB-RAL, 2021 WL 2191282, at *5 (W.D. Pa. May 6, 2021), report and recommendation adopted, 2021 WL 2190818 (W.D. Pa. May 31, 2021). Therefore, summary judgment will not be granted on these grounds.

### B. Excessive Force

As previously noted (n.5, *supra*), Mitchell's claim of being beaten by officers in the RHU is contradicted by the video. Therefore, the Court's review of Mitchell's excessive force claims is limited to Mitchell's cell

---

[8] Defendants' statement that "Plaintiff filed two grievances about the June 19, 2024[,] events" is without citation to evidence. *See* (Doc. 44 at 6, ¶ 42).

extraction and the collision with the door frame during the escort to the RHU.

The Eighth Amendment bars cruel and unusual punishment, including "the unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6 (internal quotation marks omitted). For this determination, courts consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009).

The first factor, the need for the application of force, favors the defendants. The record shows that Mitchell had recently engaged in self-

injurious behavior, was trying to tamper with restraints, and refused verbal orders to stop. Those facts justified the use of O.C. spray to obtain compliance[9], and in turn, required officers to escort Mitchell for decontamination. That Mitchell found the officers' remarks to be "antagonizing" did not obviate the need for force. *See, e.g., Wenhold v. Smith*, No. 4:22-CV-01873, 2024 WL 1894346, at *4 (M.D. Pa. Apr. 30, 2024).

The second factor, the amount of force used relative to the need, potentially supports Mitchell. A reasonable jury viewing the video could conclude that the officers pushed Mitchell down the corridor faster than Mitchell could safely walk, causing Mitchell to collide into the door frame. Defendants claim that Mitchell tried to "pull away" from them (Docs. 44-6, 44-7) and "run themselves into [the] door frame" (Doc. 45 at 13), but that is not clear from the video (which we must interpret in the light most

---

[9] *See, e.g., Gibson v. Mason*, No. 3:22-CV-1538, 2025 WL 1932743, at *14 (M.D. Pa. July 14, 2025) ("Courts have widely upheld the reasonableness of using O.C. spray to gain compliance when a prisoner ignores orders from correctional officers."); *Gibson v. Flemming*, No. 2:16-CV-0392, 2019 WL 8017850, at *9 (W.D. Pa. Dec. 2, 2019), report and recommendation adopted, 2020 WL 881436 (W.D. Pa. Feb. 24, 2020), aff'd, 837 F. App'x 860 (3d Cir. 2020); *Jackson v. Beard*, No. 3:11-CV-1431, 2016 WL 3595790, at *4 (M.D. Pa. July 5, 2016), aff'd, 704 F. App'x 194 (3d Cir. 2017)

favorable to Mitchell). Given that Mitchell was in the grasp of three officers, and was restrained by a spit hood, handcuffs, a Kuff bag, and leg shackles, it is unclear what threat Mitchell posed to anyone's safety during the walk to the RHU. In these circumstances, a jury could view the force the officers used against Mitchell as disproportionate.

The third factor, the extent of the injury inflicted, supports the defendants. Nothing in the record suggests that Mitchell sustained more than temporary discomfort from the use of O.C. spray. As for the collision with the door frame, medical records show that Mitchell reported shoulder pain and sustained an abrasion and "slight" edema on the shoulder; X-rays of the shoulder revealed no evidence of further injury. Temporary pain and minor cuts, bruises, and swelling generally do not support an inference of excessive force. *See, e.g.*, *Green v. Bledsoe*, 534 F. App'x 100, 103-05 (3d Cir. 2013) (plaintiff's "pain, swelling, numbness, [and] occasional bruising" were "indisputably . . . minor, temporary injuries"); *McKee v. Groth*, No. 4:23-CV-00181, 2024 WL 115989, at *4 n.40 (M.D. Pa. Jan. 10, 2024) (listing cases).

Mitchell now attests that "for a long time I was in great pain, now my shoulder still hurts from time to time & it is not right at times unable

to move it or move it right." (Doc. 53-2). Mitchell presents no other explanation or evidence of this claimed long-term injury. Given the medical evidence documenting the nature of Mitchell's injuries, this vague and conclusory statement does not support a genuine dispute of fact as to the injuries Mitchell suffered. *See Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018) ("[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.") (citation omitted).

The fourth factor, the extent of Mitchell's threat to staff and inmate safety, could weigh in any party's favor for the reasons discussed above. While Mitchell's recent history of self-injurious behavior and attempts to tamper with restraints constituted a threat to safety, *see, e.g.*, *Wenhold*, 2024 WL 1894346, at *4, any such risk was minimal during the time the officers were escorting the still-restrained Mitchell out of the cell.

The fifth factor, the efforts made to temper the severity of the force, supports defendants. Defendant McGary sought to avoid the use of force entirely by issuing verbal orders, but Mitchell did not comply. In these circumstances, courts have repeatedly endorsed the use of O.C. spray as a reasonable means of force to obtain compliance. *See Warrick v. Harry*,

No. 3:23-CV-591, 2024 WL 2059084, at *5 (M.D. Pa. May 8, 2024) (listing examples). It was then necessary for the officers to escort Mitchell to be decontaminated. The video shows that after Mitchell collided with the door frame, multiple officers shouted to slow down, which the group did. Regardless of the cause of the collision, the immediacy of this reaction undermines any inference that the officers engineered the collision "maliciously and sadistically for the very purpose of causing harm."

In situations calling for the use of force, officers must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary.'" *See Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). From the video of this incident, a reasonable jury could conclude that the officers should have been more careful in escorting Mitchell to the RHU. However, any such error or misjudgment "[falls] short of supporting a finding that prison officials acted maliciously and sadistically to cause harm." *Fuentes v. Wagner*, 206 F.3d 335, 346 (3d Cir. 2000) (abrogated on other grounds); *see, e.g., Wenhold v. Markle*, No. 4:22-CV-00985, 2023 WL 7336452, at *3 (M.D. Pa. Nov. 7, 2023) (granting summary judgment against a plaintiff

who "accidentally bumped into . . . his cell door during [a] crowded and slightly chaotic removal process"). While the record vividly attests to Mitchell's distress, it does not show that any defendant violated Mitchell's Eighth Amendment rights.

## V.  CONCLUSION

Accordingly, summary judgment will be granted to the defendants, and we need not address their arguments regarding improper amendment of the claims, personal involvement, qualified immunity, and the availability of compensatory damages. An appropriate order follows.

Dated: July 24, 2026          *s/Joseph F. Saporito, Jr.*
                              JOSEPH F. SAPORITO, JR.
                              United States District Judge